1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

BAYLEY CONSTRUCTION,

CASE NO. C13-0114JLR

11

Plaintiff,

ORDER ON MOTIONS FOR
SUMMARY JUDGMENT

12

v.

13
14

GREAT AMERICAN E&S
INSURANCE COMPANY,

Defendant.

15
16
17
18
19
20
21
22

This matter comes before the court on Defendant Great American E&S Insurance

Company's ("Great American") motion for partial summary judgment (GA Mot. (Dkt.

# 16)) and Plaintiff Bayley Construction's ("Bayley") motion for partial summary

judgment (Bayley Mot. (Dkt. # 30)).  This is an insurance coverage action.  Great

American moves for partial summary judgment that it had no duty to defend Bayley

under Bayley's professional liability insurance policy.  (*See generally* GA Mot.)  Bayley

moves for partial summary judgment that Great American breached its duty to defend,

breached its duty to investigate, denied Bayley's claim in bad faith, and violated

Washington's Insurance Fair Conduct Act.  (*See generally* Bayley Mot.)  Having

considered the submissions of the parties, the balance of the record, the relevant law, and

having heard oral argument, the court DENIES Great American's motion for partial

summary judgment, and GRANTS in part and DENIES in part Bayley's motion for

partial summary judgment.

## I.     BACKGROUND

**A.     The Policy**

Great American issued an insurance policy to Bayley that included coverage for

professional liability ("Policy").  (Hampton Decl. (Dkt. # 17) Ex. 6 (Policy) at 84.)  The

Policy states:

> **COVERAGE A – PROFESSIONAL LIABILITY**
>
> The Company will pay on behalf of the INSURED for LOSS and related
> LEGAL EXPENSE because of an actual or alleged act, error or omission in
> PROFESSIONAL SERVICES, which the INSURED becomes legally
> obligated to pay as a result of a CLAIM first made against the INSURED
> during the POLICY PERIOD, but only if the INSURED reports the
> CLAIM to the Company, in writing, during the POLICY PERIOD or, if
> applicable, the EXTENDED REPORTING PERIOD.

*Id.*  The Policy defines "professional services" as follows:

> **PROFESSIONAL SERVICES** means any professional services stated in
> the Declarations, or otherwise scheduled as such onto this Policy in an
> endorsement issued by the Company, performed by or on behalf of the
> INSURED.

*Id.* at 89.  The Declarations provide that "professional services" include the following
services:

PROFESSIONAL SERVICES: Construction Management, Pre-Construction Consulting Services and Design Services.

*Id.* at 83.  The Policy defines a "claim" as follows:

**CLAIM** means:
1. . . . a demand, notice or assertion of a legal right alleging liability or responsibility on the part of the INSURED, arising out of . . . an actual or alleged act, error or omission in PROFESSIONAL SERVICES, and shall include but not be limited to lawsuits, orders, petitions or governmental or regulatory actions, filed against the INSURED.

*Id.* at 86.  The Policy defines a "loss" as follows:

**LOSS** means:
1.  . . . a monetary judgment, award or settlement of:

    i. compensatory damages; or

    ii. punitive, exemplary or multiplied damages, civil fines, penalties and assessments, where insurable by law.

*Id.* at 88.

**B.     Events Underlying this Dispute**

Bayley was awarded the bid for a renovation project at the James B. Learning Resource Center at Saddleback College (the "Project") in Orange County, California. (Hampton Decl. Ex. 5 (Contract) at 59.)  The municipal owner of the Project was the South Orange County Community College District ("District").  (*Id.*)  Bayley served as the general contractor for the Project in exchange for a flat fee of $12,299,000.00.  (*Id.* at 59.)

Bayley engaged Central Tech Air Conditioning ("Central Tech") as a subcontractor to perform the heating, ventilation, and air conditioning ("HVAC") work on the Project.  (*See* Dutcher Decl. (Dkt. # 23) Ex. D. (Subcontract).)  An investigation

1   by the District's labor compliance administrator, Parsons Brinckerhoff, later revealed that

2   Central Tech was illegally paying its workers on the Project less than California's

3   prevailing wage. (Hampton Decl. Ex. 1 (Request and Notice) at 5-7.) Specifically,

4   although Central Tech issued payroll checks for the prevailing wage, it forced its workers

5   to immediately endorse and return the checks in exchange for a much smaller value of

6   cash. (*Id.*) Central Tech also underreported the hours worked by its employees. (*Id.*)

7   Bayley maintains that it was not complicit in Central Tech's illegal operations.[1] (Dutcher

8   Decl. ¶¶ 7, 9.)

9        At the conclusion of its investigation, Parsons Brinckerhoff, on behalf of the

10   District, sent the California Division of Labor Standards and Enforcement a Request for

11   Approval of Forfeiture ("Request"). (Request and Notice at 4.) Bayley received a copy

12   of the Request on January 5, 2012. (*Id.*) The Request delineated Central Tech's

13   mismanagement, the ensuing investigation, and the amount of unpaid wages and

14   penalties. (*Id.* at 5-7.) The Labor Commissioner approved the Request. (Hampton 2d.

15   Decl. (Dkt. # 33) Ex. 6 (Denial Letter) at 23.)

16        The District served Bayley with a Notice of Withholding Contract Payments

17   ("Notice") on March 8, 2012. (Request and Notice at 10.) The Notice stated the

---

[1] The parties do not dispute that, under California law, a general contractor is responsible for ensuring that all workers on a project—including subcontractors' employees—receive the prevailing wage. *See, e.g.*, Cal. Labor Code §1774 ("The contractor to whom the contract is awarded, and any subcontractor under him, shall pay not less than the specified prevailing rates of wages to all workmen employed in the execution of the contract.") Additionally, Bayley's contract with the District specified that the "CONTRACTOR shall pay and shall cause to be paid each worker engaged in work on the Project not less than the general prevailing rate, regardless of any contractual relationship which may be alleged to exist between the CONTRACTOR or any subcontractor and such workers." (Contract at 97.)

District's intent to withhold contract payments to Bayley in the amount of the unpaid wages and penalties. (*Id.*) The Notice also set forth Bayley and Central Tech's procedural rights to dispute the withholding. (*Id.*)

After receiving the Notice, Bayley sued Central Tech; Central Tech dissolved its business and both principals declared bankruptcy. (Dutcher Decl. ¶ 11.)

**C.   Bayley's Tender and Great American's Denial**

On October 22, 2012, Bayley, via its insurance broker, tendered a claim to Great American under its professional liability policy, and forwarded Great American copies of the Request and the Notice. (Hampton Decl. Ex. 2.) After receiving the claim, Great American requested and received additional information from Bayley, including copies of the contract and subcontract at issue. (*Id.* Ex. 4 at 40-41; Ex. 5 at 43-45.) Great American also retained the firm Morris, Polich and Purdy to attend and report on an upcoming settlement conference and to advise Great American on California labor law. (Hampton 2d. Decl. Ex. 15 (Shippee Depo.) at 65, 67.) On December 18, 2012, Great American sent Bayley a denial letter declining to cover the claim. (*See* Denial Letter.) Bayley initiated this suit on December 19, 2012. (Notice of Removal (Dkt. # 1) at 2).

## II.   ANALYSIS

Bayley, in its motion for summary judgment, argues that (1) Great American breached its duty to defend, (2) Great American's investigation and denial of coverage constituted bad faith, (3) as a result of Great American's alleged bad faith, Great American is estopped from denying Bayley coverage, and (4) Great American violated Washington's Insurance Fair Conduct Act ("IFCA"). (*See generally* Bayley Mot.) Great

1  American, in its motion for summary judgment, argues that it did not breach its duty to

2  defend Bayley as a matter of law, and that therefore all of Bayley's claims (with the

3  exception of a claim for procedural bad faith) must fail.  (*See generally* GA Mot.)  The

4  court addresses each argument in turn below.

5  **A.  Summary Judgment Standard**

6      Summary judgment is appropriate if the evidence, when viewed in the light most

7  favorable to the non-moving party, demonstrates "that there is no genuine dispute as to

8  any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

9  P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cnty. of*

10 *L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  The moving party bears the initial burden of

11 showing there is no genuine issue of material fact and that he or she is entitled to prevail

12 as a matter of law.  *Celotex*, 477 U.S. at 323.  If the moving party meets his or her

13 burden, then the non-moving party "must make a showing sufficient to establish a

14 genuine dispute of material fact regarding the existence of the essential elements of his

15 case that he must prove at trial" in order to withstand summary judgment.  *Galen*, 477

16 F.3d at 658.  The court is "required to view the facts and draw reasonable inferences in

17 the light most favorable to the [non-moving] party."  *Scott v. Harris*, 550 U.S. 372, 378

18 (2007).

19 **B.  Duty to Defend**

20     An insurer has a duty to defend "when a complaint against the insured, construed

21 liberally, alleges facts which could, if proven, impose liability upon the insured within the

22 policy's coverage."  *Truck Ins. Exch. v. VanPort Homes,* 58 P.3d 276, 281-82 (Wash.

2002).  The duty to defend is broader than the duty to indemnify.  *Am. Best Food, Inc. v. Alea London, LTD*, 229 P.3d 693, 696 (Wash. 2010) (citing *Safeco Ins. Co. of Am. v. Butler*, 823 P.2d 499, 504-05 (Wash. 1992)).  Whereas the duty to indemnify "hinges on the insured's *actual liability* to the claimant and *actual coverage* under the policy," the duty to defend "arises based on the insured's *potential* for liability and whether allegations in the complaint *could conceivably* impose liability on the insured."  *Woo v. Fireman's Fund Ins. Co.*, 164 P.3d 454, 462-63 (2007) (emphasis in original).

The insurer is relieved of its duty to defend only if the alleged claim is "clearly not covered by the policy."  *VanPort Homes*, 58 P.3d at 282.  "If there is any reasonable interpretation of the facts or the law that could result in coverage, the insurer must defend."  *Alea London*, 229 P.3d at 696.  If a complaint is ambiguous, a court will construe it liberally in favor of "triggering the insurer's duty to defend."  *Woo*, 164 P.3d at 459.  Similarly, an insurer cannot rely on an equivocal interpretation of the case law to give itself—rather than the insured—the benefit of the doubt.  *Id.* at 463.

The duty to defend must be determined only from the complaint, unless (1) the complaint provides too little factual detail, or (2) the allegations in the complaint are ambiguous or conflict with information known to or readily ascertainable by the insurer.  *See Woo*, 164 P.3d at 459.  Even then, an insurer may only rely on extrinsic facts to trigger—not deny—the duty to defend.  *Id.*

1

**1.  Potential for liability**

2      Here, the Response and the Notice, both of which Great American received at the

3 time Bayley tendered its claim, could serve as a functional complaint.[2]  Comparing the

4 Response and Notice to the Policy shows that the facts alleged therein could conceivably

5 impose a covered liability on Bayley.

6      Specifically, the District's Request seeks approval from the Division of Labor

7 Standards and Enforcement to withhold contract payments to Bayley on the basis of the

8 labor compliance program's investigation and findings regarding Central Tech.  (Request

9 and Notice at 5.)   The Request identifies Bayley as the "Affected Contractor," Central

10 Tech as the "Affected Subcontractor," and the District as the "Awarding Body."  (*Id.*)

11 The Request provides a "General Description of the Scope of Work of the Entire

12 Project," stating:  "Renovations of Saddleback College Learning Resource Center

13 includes [sic] partial demolition, complete renovation of 100,000 square foot library

14 building, and modernizations . . . ."  (*Id.*)  The Request then details the labor compliance

15 program's investigation into Central Tech, describes Central Tech's strategy of

16 underpaying workers and falsifying payment records, summarizes the audit, and

17 recommends wages and penalties due under specific sections of the California Labor

18 Code.  (*Id.* at 6-8.)  The Request concludes that Bayley and Central Tech owe "Potential

19 Liquidated Damages" of $427,709.14 and penalties of $101,750.00.  (*Id.* at 5.)

20

21      [2] The Policy defines a "claim" to include a "demand, notice or assertion of a legal right."
22 (Policy at 86.)

1    Similarly, the Notice reiterates that the District's labor compliance program

2   identified violations of the California Labor Code with respect to the Project resulting in

3   unpaid wages of $427,709.14 and penalties of $101,750.00.  (*Id.*)  The Notice identifies

4   the District as the "Awarding Body," Bayley Construction as the "Prime Contractor" and

5   Central Tech as the "Subcontractor" on the Project.  (*Id.*)  The Notice informs Bayley that

6   the District is withholding contract payments in the amount of unpaid wages and

7   penalties.  (*Id.*)  The Notice provides that Bayley must submit a written Request for

8   Review within 60 days to obtain a hearing, and that failure to respond "will result in a

9   final order which shall be binding."  (*Id.* at 11.)

10    Therefore, from the face of the Response and Notice, Great American was

11   aware that Bayley was serving as the prime contractor on a construction project,

12   that the subcontractor Bayley hired had failed to pay its workers California's

13   prevailing wage, and that Bayley was facing liability under California law for that

14   failure.  The Policy provides coverage for a "loss" due to an "act, error, or

15   omission in professional services," where professional services are defined as:

16   "Construction Management, Pre-Construction Consulting Services and Design

17   Services," and "loss" is defined "a monetary judgment, award or settlement" that

18   includes "compensatory damages . . . punitive, exemplary or multiplied damages,

19   civil fines, penalties and assessments."  (Policy at 83, 88.)  The facts alleged in the

20   Notice and Response conceivably indicate a "loss"[3] due to an "act, error, or

21

22   _____

[3] The penalties assessed under California Labor Code could constitute a "loss."  The

ORDER- 9

1  omission" by Bayley in conducting "construction management" of the Project that

2  could be covered by the Policy.

3        **2.   "Professional services"**

4        Great American's argument that it owes Bayley no duty to defend is premised on

5  its interpretation of the term "professional services."  (GA Mot. 9-15.)   In a nutshell,

6  Great American seeks to define "professional services" as services that "require the

7  exercise of professional skill and judgment" or "specialized knowledge or skill."  (*Id.* at

8  10).  In Great American's view, paying workers the appropriate prevailing wage does not

9  require special skill or judgment, but rather is an obligation common to every public

10  works contractor, and therefore is not a professional service covered by the policy.  (*Id.* at

11  1-12.)

12        In the context of a duty to defend analysis, this argument is unavailing.  Nothing

13  within the four corners of the Policy necessitates—or supports—Great American's

14  definition of professional services.  To the contrary, the Policy explicitly defines

15

16  withheld contract payments could also constitute a "loss," because Bayley in effect would be
17  required to pay the prevailing wage twice:  Bayley's flat-sum contract with Central Tech assumed
   that Central Tech would pay its workers the prevailing wage.  (*See* Subcontract at 18; Dutcher
   Decl. ¶ 13.)

18        Great American's denial letter points out that the Policy excludes "liquidated damages"
   from the definition of "loss," and argues that the Policy is inapplicable because the Notice at one
19  point describes the unpaid wages as liquidated damages.  (Denial Letter at 25.)  However, the
   Notice provides that liquidated damages only become due if the contractor fails to post a bond
20  within 60 days, and that subsequent administrative proceedings may alter the amount of wages
   and penalties due.  (Request and Notice at 13-14.)  Moreover, the parties continue to dispute the
   definition of "liquidated damages" under the Policy, California law, and Washington law.  (*See,*
21  *e.g.*, Bayley Mot. at 13-14, 21-22; Resp. to Bayley Mot. (Dkt. # 32) at 18-19; Reply to Bayley
   Mot. (Dkt. # 34) at 9.)  Therefore, the mere appearance of the term "liquidated damages" in the
22  Notice is not an appropriate basis for deciding that Bayley's claim was "clearly not covered by
   the policy."  *See VanPort Homes,* 58 P.3d at 282.

1   professional services as "Construction Management, Pre-Construction Consulting

2   Services and Design Services." (Policy at 83.)   Neither does Great American supply any

3   precedent defining "professional services" in the context of construction management or

4   a prevailing wage claim.  Rather, Great American relies on cases from outside

5   Washington State which hold that the submission of medical billing claims under the

6   False Claims Act does not qualify as a "professional service."  *See, e.g.*, *Zurich Am. Ins.*

7   *Co. v. O'Hara Regional Ctr. for Rehabilitation,* 529 F.3d 916, 925 (10th Cir. 2008);

8   *Medical Records Assoc., Inc. v. Am. Empire Surplus Lines Ins. Co.*, 142 F.3d 512, 515-16

9   (1st Cir. 1998)); *Horizon West, Inc. v. St. Paul Fire & Marine Ins. Co.,* 214 F. Supp. 2d

10  1074, 1079 (E.D. Cal. 2002); *MSO Washington, Inc. v. RSUI Grp., Inc.*, C12-6090 RJB,

11  2013 WL 1914482 (W.D. Wash. May 8, 2013).  These cases are less than compelling.[4]

12  And an insurer may not rely upon equivocal case law to give itself the benefit of the

13  doubt rather than its insured.  *Woo*, 164 P.3d at 463.

14      Moreover, Great American's interpretation conflicts with other principles of

15  policy interpretation.  Under Washington state law:  inclusionary clauses in insurance

16  contracts are liberally construed in favor of covering all acts fairly embraced by the

17  _____

18      [4] Great American's reliance on *Bank of California, N. A. v. Opie*, 663 F.2d 977 (9th Cir. 1981) is
    also not persuasive.  Although Great American cites *Opie* for its assertion that professional services

19  require specialized knowledge or skill (GA Mot. at 10), the court in *Opie* required only that:  "To be
    considered a professional service, the conduct must arise out of the insured's performance of his

20  specialized vocation or profession."  *Opie*, 663 F.2d at 981.  Accordingly, the court found that a mortgage
    banker's policy was triggered when the conduct at issue "was clearly part of [defendant's] usual day-to-
    day business operations" in its profession as a mortgage banker.  *Id.*  Here, tracking subcontractors' wage

21  payments could constitute part of Bayley's day-to-day business operations in its profession as a general
    contractor.

22

ORDER- 11

1   specified terms, *Hawaiian Ins. and Guar. Co., Ltd. v. Federated Am. Ins. Co.*, 534 P.2d

2   48, 56 (Wash. Ct. App. 1975); policy language is given a "sensible construction as would

3   be given to the contract by the average person," *Am. Nat'l Fire Ins. Co. v. B & L*

4   *Trucking & Const. Co.*, 951 P.2d 250, 256 (Wash. 1998); and ambiguities in the policy (if

5   any) are resolved in favor of the insured, *Quadrant Corp. v. Am. States Ins. Co.*, 110 P.3d

6   733, 737 (Wash. 2005).  Applying these principles, it is not clear that the term

7   "professional services" limits the "construction management" conduct covered by the

8   Policy.  *See VanPort Homes*, 58 P.3d at 282 (stating that an insurer is relieved of its duty

9   to defend only if the alleged claim is "clearly not covered by the policy").  At this stage,

10  Great American cannot rely on its own narrow interpretation of "professional services" to

11  deny a defense.  *See Alea London*, 229 P.3d at 701.

12       Even assuming that Great American's interpretation of professional services

13  applied, Great American errs in its application to the instant context.  Great American is

14  required to construe the facts liberally in favor of triggering the insurer's duty to defend.

15  *Woo*, 164 P.3d at 459; *see also Alea London*, 229 P.3d at 696 ("If there is any reasonable

16  interpretation of the facts or the law that could result in coverage, the insurer must

17  defend.")  Although, as Great American argues, paying workers the prevailing wage may

18  not, in the abstract, rise to the level of "professional services" contemplated by the policy,

19  in the context of overseeing a large construction project with multiple subcontractors, it

20  could.  *See Opie*, 663 F.2d at 981-82.

21       Here, the Request and Notice show that Bayley was the general contractor on a

22  $12 million renovation project of considerable scope:  the Project encompassed

"mechanical, electrical and plumbing systems; interior wall framing, drywall, taping, and painting; formwork and rebar; metal decking and stairway; structural steel installation; roofing; flooring; plastering; underground utilities; skylight installation; ADA upgrades; landscaping; fireproofing." (Request and Notice at 5.) The forfeiture, however, applies to only one piece of the project: "Sheet Metal/HVAC." (*Id*.) A liberal and reasonable construction of these facts would be that ensuring subcontractors' compliance with prevailing wage laws on a project of this scope required professional skill and judgment.[5]

Extrinsic evidence, which Great American considered in its denial of coverage, supports this conclusion. (*See* Shippee Dep. at 66 (explaining that Great American's claims counsel investigated extrinsic evidence)); *see also Vanport Homes*, 58 P.3d at 282 ("If coverage is not clear from the face of the complaint but may exist, the insurer must investigate the claim.") The Contract between Bayley and the District shows that Bayley's responsibilities as prime contractor were to "provide, furnish, and pay for all the labor, materials, necessary tools, expendable equipment, and all taxes, utility and

---

[5] In reaching this conclusion, the court does not consider the declaration of Bayley's expert, Mr. Amento, or the opinion testimony of Bayley's employee, Mr. Dutcher, regarding the meaning of and skill inherent in "construction management." (*See* Amento Decl. (Dkt. # 21); Dutcher Decl. ¶ 14.) This testimony is irrelevant because the duty to defend is evaluated by comparing the insurance policy to the facts alleged in the complaint.

Additionally, Great American moves to strike these declarations, as well as the declaration of Mr. Thorne, because Bayley failed to disclose any experts to Great American before the deadline for expert disclosures. (*See* Reply to GA Mot. (Dkt. # 26) at 2 (citing Minute Order Setting Trial Dates and Related Dates, (Dkt. # 11).) At oral argument, Bayley's counsel conceded that Bayley did not disclose Mr. Amento as an expert witness before the deadline, and that Bayley does not oppose Great American's motion to strike Mr. Amento's declaration. Accordingly, the court strikes Mr. Amento's declaration (Dkt. # 21). Because Bayley did not disclose Mr. Thorne and Mr. Dutcher as experts, the court also strikes the declarations of Mr. Thorne (Dkt. # 20) and Mr. Dutcher (Dkt. # 23) to the extent these declarations contain opinion testimony.

transportation services required for construction of the Project," (Contract at 59), and that Bayley was "solely responsible for the means, methods, techniques, sequences, and procedures of construction," (*id.* at 68).  The Contract also provides that Bayley "shall pay and shall cause to be paid each worker engaged in work on the Project not less than the general prevailing rate of per diem wages determined by the Director, regardless of any contractual relationship which may be alleged to exist between the CONTRACTOR or any subcontractor and such workers." (*Id.* at 97.)  Again, a liberal and reasonable construction of these facts would be that managing the responsibilities assigned under the Contract, including ensuring all subcontractors' compliance with prevailing wage laws, was a task requiring professional skill and judgment.[6]

### 3.  Conclusion regarding the duty to defend

Summary judgment regarding the duty to defend is appropriate because "the interpretation of language in an insurance policy is a matter of law." *Black v. Grange Ins. Ass'n*, C08-1699Z, 2009 WL 4110300, at *5 (W.D. Wash. Nov. 19, 2009) (quoting

---

[6] Great American also argues that Bayley was not performing "construction management" because the Contract lists McCarthy Building Companies, Inc. (not Bayley) as "Construction Manager . . . authorized to act on behalf of the District." (GA Mot at 14 (citing Contract at 4).)  But Great American cannot rely on evidence extrinsic to the Notice and Response to deny Bayley coverage. *See Woo*, 164 P.3d at 459.  Furthermore, there is nothing within the Policy that restricts coverage to an entity with the title "construction manager"—rather, the policy covers the act of "construction management." *See Opie*, 663 F.2d at 981 (stating that, to determine whether an act constitutes "professional services," the court "must look not to the title or character of the party performing the act, but to the act itself.") Similarly, there is nothing within the Policy that indicates that the act of "construction management" can only be performed by one entity per construction project.  In fact, Great American's own employees concluded that Bayley was "probably" engaging in construction management. The first entry in Bayley's claim file, which summarizes a discussion between Great American claims counsel Patricia Shippee and assistant vice-president Bill North concludes:  "contract oversight, making sure your sub pays prevailing wages may qualify as CM [construction management], not sure, probably."  (Tristan Decl. (Dkt. # 24) Ex. A at 2.)  Therefore, this argument is also unpersuasive.

ORDER- 14

*Allstate Ins. Co. v. Peasley*, 932 P.2d 1244, 1246 (Wash. 1997).)  Here, the facts alleged

in the Request and Notice indicate a potential for covered liability under the plain

language of the Policy.  Great American's argument that the term "professional services"

should be interpreted to limit the type of "construction management" acts covered

implicates the question of actual liability, rather than the "potential for liability"

contemplated in a duty to defend analysis.  *See Woo*, 164 P.3d at 463.  And even if Great

American's interpretation is assumed to apply, a liberal construction of the facts does not

permit the conclusion that Bayley's professional services claim is clearly not covered by

the policy.  *See VanPort Homes*, 58 P.3d at 282.  Accordingly, the court denies Great

American's motion for summary judgment that Great American had no duty to defend

Bayley against the District's withholding of contract payments, and grants Bayley's

motion for summary judgment that Great American breached its duty to defend.

## C.  Bad Faith

An insurer acts in bad faith if its denial of coverage is "unreasonable, frivolous, or

unfounded."  *Overton v. Consol. Ins. Co.*, 38 P.3d 322, 329 (Wash. 2002).  Moreover, a

claim for bad faith claims handling remains viable even if an insurer did not breach its

duty to defend, pay, or settle.  *St. Paul Fire and Marine Ins. Co. v. Onvia, Inc.*, 196 P.3d

664, 669 (Wash. 2008).   Claims of bad faith "are not easy to establish and an insured has

a heavy burden to meet."  *Overton*, 38 P.3d at 329.  Whether an insurer acted in bad faith

is a question of fact.  *Smith v. Safeco Ins. Co.*, 78 P.3d 1274, 1277 (2003).  Therefore, if

"reasonable minds could differ that the insurer's conduct was reasonable, or if there are

1    material issues of fact with respect to the reasonableness of the insurer's action, then

2    summary judgment is not appropriate." *Id.*

3          Here, Bayley asserts three types of bad faith claims against Great American.  First,

4    Bayley asserts that Great American's denial of a defense was unreasonable or unfounded.

5    (Bayley Mot. at 2, 22-23; Reply to Bayley Mot. (Dkt. # 43) at 9-11.)   Next, Bayley

6    asserts that Great American's denial of coverage was unreasonable or unfounded.  (*Id.*)

7    Finally, Bayley also asserts that Great American's handling of the claim was in bad faith

8    because Great American did not conduct a proper investigation.  (*Id.*)

9          **1.       Denial of a defense**

10          Bayley argues that Great American's reliance on an "arguable" interpretation of

11    case law to define "professional services" was unreasonable under *Alea London* and

12    therefore constitutes bad faith as a matter of law.  (Bayley Mot. at 22.)  However, unlike

13    the insurer in *Alea London*, Great American has not ignored contradictory, analogous

14    case law.  Moreover, Great American's denial of coverage was not founded solely on the

15    precedent it cites in its summary judgment motion—Great American's denial letter also

16    relied on two other justifications.

17          First, Great American concluded that the Request and Notice did not show that

18    Bayley was performing "construction management."  (Denial Letter at 25.)  Bayley offers

19    expert testimony regarding the meaning and scope of "construction management."

20    However, as discussed above in Section II(B)(2), footnote 5, since Bayley did not timely

21    disclose its experts to Great American, the court declines to consider that testimony.

22

1    Second, Great American concluded that the unpaid wages and penalties withheld

2    from Bayley's contract payments constituted either "liquidated damages" or

3    "disgorgement," both of which are exceptions to the definition of "loss" covered by the

4    Policy.  (Denial Letter at 25-26.)  Bayley argues that an adequate investigation by Great

5    American would have revealed that Bayley posted a bond that ostensibly removed the

6    threat of liquidated damages as defined by the California statutes cited in the Notice.

7    (Bayley Mot. at 13-14.)  Great American responds that a sum certain such as the unpaid

8    wages nonetheless constitutes "liquidated damages" under Washington law.  (Resp. to

9    Bayley Mot. at 18-19.)

10   Great American also brings forth evidence that Bayley's own insurance brokers

11   were uncertain as to whether Bayley's claim fell within the professional services policy.

12   For example, Jim Sorte, Vice President and Claims Executive at Bayley's insurance

13   broker, Parker Smith & Feek, cautioned Bayley that:  "The scenario is unique, so it is

14   difficult for us to definitively say that coverage will be triggered under the insurance

15   policies."  (Hampton 2d. Decl. Ex. 7 at 30).  When Mr. Sorte explained the situation to his

16   colleague, Jim Hamlin, Mr. Hamlin's reaction was:  "That is completely strange!  Never

17   had one such as that in the past."  (Hampton 2d. Decl. Ex. 1 at 6.)  Mr. Hamlin

18   concluded: "Not sure either professional or D&O would respond in this case but worth a

19   try I suppose."  (*Id.*)

20   Viewing the facts in the light most favorable to Great American, the court

21   concludes that reasonable minds could differ as to whether Great American's denial of a

22   defense was unreasonable.  This discrepancy should be resolved by the trier of fact.

*Smith*, 78 P.3d at 1277.  Accordingly, the court denies summary judgment with respect to the alleged unreasonableness of Great American's denial of a defense.

### 2.  Denial of coverage

Since the duty to defend is broader than the duty to indemnify, the court denies summary judgment with respect to the alleged unreasonableness of Great American's denial of coverage for the same reasons as stated in the immediately preceding section.

### 3.  Duty to investigate

An insurer's duty of good faith to its insured includes the duty to conduct a reasonable investigation before denying coverage.  *Coventry Associates v. Am. States Ins. Co.*, 961 P.2d 933, 938 (Wash. 1998) (quoting Allan D. Windt, *Insurance Claims & Disputes: Representation of Insurance Companies and Insureds* § 2.05, at 38 (3d ed.1995).)  An insurer "acts without reasonable justification when it denies coverage based upon suspicion and conjecture."  *Indus. Indem. Co. of the Nw., Inc. v. Kallevig*, 792 P.2d 520, 526 (Wash. 1990) (citing *Safeco Ins. Co. of Am. v. JMG Restaurants, Inc.*, 680 P.2d 409, 418 (1984).)

Bayley argues that Great American's investigation was inadequate because Great American did not research the meaning of the term "construction management" within the construction industry or inquire as to the level of skill and judgment that Bayley exercised in its role as general contractor for the Project.  (Bayley Mot. at 5-6, 14-17 (citing testimony from Great American's 30(b)(6) deponent, Ms. Patricia Shippee).)  To support its argument that Great American's investigation was unreasonable as a matter of law, Bayley cites cases in which, for example, the claims handler "conducted no

ORDER- 18

1    investigation at all," *Aecon Bldgs., Inc. v. Zurich N. Am*, 572 F. Supp. 2d 1227, 1237

2    (W.D. Wash. 2008), and in which the insurer "offer[ed] no support for the notion that *any*

3    investigation preceded its determination as to [coverage]," *Travelers Cas. & Sur. Co. of*

4    *Am. v. Spectrum Glass Co., Inc.*, C11-1324-JCC, 2012 WL 3780356 (W.D. Wash. Aug.

5    31, 2012).  That is not the case here.

6        Here, Great American provides evidence that, after Bayley's tender, Great

7    American requested, received, and reviewed additional information and documents from

8    Bayley, including a copy of the Contract, a copy of the Subcontract, and transcripts of

9    depositions (Hampton Decl. Ex. 4 at 40-42; *id*. Ex. 5 at 43-45), consulted with Bayley's

10   insurance broker Jim Sorte at Parker, Smith, and Feek regarding the claim (Shippee Dep.

11   at 68), and retained California labor law firm Morris Polich & Purdy to advise on

12   California labor law (*id.* at 65), participate in a settlement conference between Bayley

13   and the District (*id.* at 65), and draft a legal coverage opinion (*id.* at 67).  All in all, Great

14   American's investigation lasted almost two months.  (*See* Hampton Decl. Ex. 2 at 1;

15   Denial Letter at 1.)

16       Viewing the facts in the light most favorable to Great American, the court finds

17   that Great American has raised a triable issue of fact with respect to the reasonableness of

18   its investigation.  Accordingly, the court denies Bayley's motion for summary judgment

19   that Great American breached its duty to investigate.

20   **D. Estoppel**

21       Typically, if an insured prevails on a bad faith claim, the insurer is estopped from

22   denying coverage.  *Aecon Bldgs*, 572 F. Supp. 2d at 1234 (citing *Mut. of Enumclaw Ins.*

ORDER- 19

1   *Co. v. Dan Paulson Const., Inc.*, 169 P.3d 1, 10 (Wash. 2007)); *but see St. Paul Fire*, 196

2   P.3d at 669 (no presumption of harm for procedural bad faith when no coverage is due).

3   Because the court denies Bayley's motion for summary judgment that Great American

4   acted in bad faith, the court also denies Bayley's motion for summary judgment on

5   estoppel.

6   **E.  The IFCA**

7           The IFCA establishes a cause of action for "[a]ny first party claimant to a policy

8   of insurance who is unreasonably denied a claim for coverage."  RCW 48.30.015(1).

9   Bayley asserts that Great American's alleged violations of the WAC automatically

10  constitute a violation of the IFCA.  (Bayley Mot. at 23); *but see Lease Crutcher Lewis*

11  *WA, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, C08-1862RSL, 2010 WL

12  4272453 (W.D. Wash. Oct. 15, 2010) (holding that a violation of the WAC is not a per se

13  violation of the IFCA).  Bayley argues that Great American violated the WAC because

14  (1) Great American failed to conduct a reasonable investigation as required by WAC

15  284-30-330(4), and (2) Great American's denial letter failed to "provide a reasonable

16  explanation of the basis . . . for denial of a claim" as required by WAC 284-30-330(13).

17  (Baylet Mot. at 23.)   The court has already found that there are genuine issues of

18  material fact regarding both of these topics.  *See* Section II(C)(1) (discussing the denial

19  letter); Section II(C)(3) (discussing the investigation).  The court has also already found

20  that there are genuine issues of material fact as to whether Great American's denial of

21  coverage was unreasonable.  *See* Section II(C)(2).  Therefore, the court denies summary

22  judgment on the IFCA claim.

1

**III.    CONCLUSION**

2          For the foregoing reasons, the court DENIES Defendant Great American's motion

3  for summary judgment (Dkt. # 16).  The court GRANTS Plaintiff Bayley Construction's

4  motion for summary judgment (Dkt. # 30) on the duty to defend only, and DENIES the

5  motion in all other respects.

6          Dated this 1st day of November, 2013.

7

8

9

JAMES L. ROBART
United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER- 21